

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DANA CASNOCHA-JONES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86087 |
| | ) | |
| STATE BOARD OF NURSING, | ) | Filed: March 12, 2024 |
| | ) | |
| Appellant. | ) | |

### Appeal from the Circuit Court of Cole County
### The Honorable S. Cotton Walker, Judge

### Before Division One: Alok Ahuja, P.J., and
### Cynthia L. Martin and Thomas N. Chapman, JJ.

The State Board of Nursing initiated a disciplinary proceeding against registered nurse Dana Casnocha-Jones. Jones[1] stipulated that cause existed to discipline her license based on her diversion of opioid pain medications for personal use while working at a hospital. Following a hearing, the Board revoked Jones' nursing license. Jones filed a petition for judicial review. The circuit court set aside the Board's disciplinary order, and ordered that the Board issue Jones a probated license. The Board appeals. We affirm.

---

[1]    In her briefing, the appellant refers to herself using the surname "Jones"; we do likewise.

**Factual Background**

Jones began working as a staff nurse at Mercy Hospital East in St. Louis beginning in August 2018. The State Board of Nursing issued her a Missouri registered professional nursing license in approximately September 2018.

Within months of beginning her employment, Jones began taking intravenously injectable opioid pain medications (morphine and hydromorphone) from the hospital for personal use. Jones would obtain these drugs when she administered pain medications to patients. Frequently, the drug vials contained more medication than was required to be administered. After providing the patient with the correct dosage, Jones would then take the residue from the vial for her personal use. She would re-fill the vial with an identical amount of a saline solution, and would show the vial to another nurse, who would confirm that it contained the appropriate amount of residual liquid. The vial could then be discarded as medical waste. Besides scavenging remaining medication from vials she herself had used, Jones would also take leftover medication from other nurses' partially used vials; she retrieved the used vials from the medical waste disposal containers in which they had been discarded.

Jones testified that she never sold or gave away any of the medication she diverted, and never obtained controlled substances through other illicit means. She also denied that she had ever given a patient less than their full prescribed dosage of a medication.

Jones admitted to taking at least one vial of medication during each of the three shifts that she worked every week. Jones maintained that she did not use drugs during her work shifts. She acknowledged during the hearing before the

Board that the quality of her patient care may have been affected by her opioid use, because she was so focused on obtaining drugs while at the hospital.

On July 5, 2019, hospital personnel found Jones attempting to remove items from a medical waste container. Jones claimed that she was looking for a misplaced stethoscope. The hospital suspended her from work, and asked her to provide a urine sample for drug testing. On July 23, while Jones was suspended and awaiting test results, employees observed her in the hospital on two different occasions, handling medical waste containers. Hospital security found that Jones had used her employee badge to access entrances and medication rooms throughout the hospital 127 times from the start of her suspension on July 5, 2019, through July 23, 2019 (which would constitute approximately 15 or 20 separate visits to the hospital, assuming she entered multiple rooms per visit). The hospital revoked Jones' security badge access the same day. On the night of July 23, 2019, Jones attempted to enter the hospital with her badge again. Although her security badge was inoperative, she was able to gain access to the building as another employee exited; Jones then unsuccessfully attempted to enter a room containing medications.

The next day, security found multiple needles, vials of medication, saline, and a bloody paper towel in Jones' locker. The drug sample collected on July 5 returned positive for morphine - a controlled substance for which Jones did not have a prescription. The hospital terminated Jones' employment on July 24, 2019.

Jones entered an intensive outpatient substance abuse program within a few days of her termination. She participated in the intensive outpatient

3

program for six months, until January 2020.  The program included multiple weekly individual, family, and group therapy sessions; psychiatric consultations; and the use of an agonist medication (naltrexone) to reduce her cravings for opioids.  During her intensive outpatient treatment, Jones attended at least one hundred group therapy sessions, and more than fifty individual therapy sessions. She also underwent nearly sixty drug screens, all of which were negative for opioids, except for the initial sample she submitted shortly after beginning treatment, which was indicative of her use prior to entering treatment.

After completing the intensive outpatient program in January 2020, Jones attended aftercare group therapy sessions three times per week for more than a year, and testified that she continued to participate in such sessions occasionally at the time of the disciplinary hearing.  Jones also took agonist medications to manage her cravings for approximately a year after entering treatment, as recommended by the treatment program.

Upon completion of her intensive outpatient program, Jones began employment as a nurse at a kidney dialysis center in January 2020.  As of the time of the disciplinary hearing, Jones had been promoted twice, and was serving as a facility administrator overseeing a dialysis center.  The dialysis facilities do not stock controlled substances, and therefore Jones had no access to such substances through her employment.

On March 19, 2020, the State Board of Nursing informed Jones that it had cause to terminate her nursing license.  Jones and the Board engaged in settlement negotiations, but were unable to agree to a comprehensive resolution of the disciplinary proceeding.  Jones and the Board did, however, enter into a

4

stipulation on March 7, 2022.  In the stipulation, Jones admitted that she had unlawfully possessed morphine, and that cause existed to discipline her nursing license under §§ 335.066.2(1), (6), (13), (15) and (25).[2]  Jones also stipulated to a number of facts.  Thus, she stipulated that her July 2019 urinalysis was positive for morphine, for which she did not have a prescription.  Jones also admitted that she had been discovered rummaging through a medical waste container; offered an explanation which the hospital did not believe; was suspended; attempted to enter the hospital on numerous occasions after being suspended; and that, following her suspension, she was again found in medication rooms, and again offered spurious explanations for her presence.  Jones also admitted that hospital security found drug paraphernalia in her locker.

A hearing was held on May 18, 2022.  Prior to the hearing, Jones voluntarily submitted a hair sample for drug testing on April 28, 2022, which tested negative for 10 categories of controlled substances, including opioids.

Jones testified on her own behalf, and also called two witnesses.  One was a substance abuse counselor who had overseen her treatment, and the other was a supervisor from the dialysis facility where she began employment in January 2020.

The substance abuse counselor's testimony described the nature of Jones' intensive outpatient treatment program, and her aftercare.  The counselor testified that during therapy Jones was honest concerning her diversion and use of drugs, and was an active participant in group therapy sessions.  The counselor testified that Jones had a strong support system including her husband and other

---

[2]      Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2023 Cumulative Supplement.

family. The counselor stated that Jones' recovery had been "amazing," that the stability of her recovery was "excellent," and that he did not often see people respond to treatment as well as she did.

The dialysis center supervisor testified that Jones began working at the dialysis facility in early 2020. He testified that Jones disclosed her history of substance abuse and treatment during the hiring process. The supervisor testified that Jones was "[v]ery high-performing," and acted not only as a nurse, but "was able to take on additional responsibilities as a leader in the facility." As a facility administrator, Jones was "the CEO of [her] facility," responsible for personnel issues, budgeting, clinical outcomes, and regulatory compliance.

Jones also submitted a letter from the medical director of her substance abuse treatment program, a psychiatrist. The psychiatrist reported that Jones "was extremely participative in all aspects of the [treatment] program," and "has met the expected goals of addiction care and at this point [is] considered to be in complete abstinence with sustained remission." The psychiatrist stated his "strong[ ] belie[f] that [Jones'] history of substance abuse will not affect or interfere with providing competent clinical care."

During her testimony before the Board, Jones testified that she began using narcotics after having a miscarriage in October 2018 and becoming "very depressed." She described the manner in which she surreptitiously collected the opioid medications left in vials which she and other nurses had used. Jones admitted that she had lied to a supervisor when she was first discovered rummaging through a medical waste container, and that she had entered the hospital – and successfully obtained waste narcotics – on multiple occasions

following her suspension.  Jones acknowledged that she "went to fairly significant lengths to hide this from [her] family," that she did not stop even after being caught and suspended, and that she had stolen not only medications, but also injection supplies, from the hospital.  When asked how her behavior comported with the standards of honesty expected of a nurse, Jones responded:

> At the time I was deep in addiction and not truthful. That is not who I am today.  And that is not who I am as a nurse now.  . . . [T]he reason I was dishonest was because I didn't want to be caught at the time, and I didn't want to admit to myself that I had a problem.  But I have since accepted responsibility for what I've done. And that's not who I am anymore.

Jones testified that she disclosed her prior substance abuse history to the dialysis center in the hiring process because "I wanted a fresh start, and I felt like the best way to do that was just to be honest about what had happened."

After describing her intensive outpatient therapy and aftercare program, Jones testified that she believed she had a stable recovery.  She stated that she would be willing to submit to ongoing drug testing, and asked the Board to allow her current treatment team to continue to oversee her recovery.

The Board presented no evidence at the disciplinary hearing, other than the stipulation in which Jones admitted to the facts underlying the termination of her employment, and stipulated that cause for discipline existed.  Notably, the stipulation did not address Jones' substance abuse treatment, or her successful post-July 2019 employment.

On July 5, 2022, the Board issued its order revoking Jones' nursing license. The Board's order states:

> In this case, the Board is tasked with weighing the severity of Respondent's conduct against the positive efforts Respondent has

7

taken to better herself. It is certainly commendable the things Respondent has done since being terminated from Mercy in an effort to address her substance use disorder. But the most troubling aspect to her disorder and prior conduct, which the Board finds has not been adequately addressed in her evidence of rehabilitation, is the degree of dishonesty and how her wrongdoing began so soon after she received her nursing license.

Approximately one year from obtaining licensure as an RN, Respondent began diverting controlled substances from her employer. Even after being placed on leave after she was discovered going through a Sharps container, Respondent made numerous attempts (over a hundred according to recordings of her name badge) over a period less than three (3) weeks to obtain more controlled substances. Respondent also intentionally replaced medicine in vials with saline in an effort to deceive others of her wrongdoing. In addition to her devious actions, Respondent repeatedly lied to coworkers, her employer, and her husband. The degree of Respondent's subterfuge is difficult to understate.

One of the primary tenets of nursing is that its members conduct themselves honestly. Numerous aspects of the nursing profession require honesty from nurses, including the handling of controlled substances. Respondent has failed to adhere to this standard. Her wrongdoing diverted her attention from her patients, disrupted the operations of her employer, and potentially eroded the public's faith in nurses. . . .

. . . The Board therefore finds and concludes, based on the evidence of this case, that the appropriate level of discipline for the license of Respondent, Dana Casnocha Jones, is revocation in order to safeguard the health of the public.

Jones filed a petition for judicial review in the Circuit Court of Cole County on August 4, 2022. While the action was pending, the court stayed the effect of the Board's disciplinary order.

The circuit court issued its judgment reversing the Board's order revoking Jones' license on January 29, 2023. The court noted that the Board had

8

presented no evidence at the disciplinary hearing, and had relied only on the parties' stipulations, which did not address Jones' post-July 2019 conduct. The judgment concluded that

> [t]here was no substantial and competent evidence to support the Board's conclusion that [Jones] had not adequately addressed issues of dishonesty as part of her recover from substance use disorder, and in fact all of the evidence presented at the hearing was that she had been rigorously honest regarding her substance use disorder and diversion since entering into recovery.

The court found that "[a]ll of the evidence introduced at the disciplinary hearing supports the conclusion that [Jones] has been rehabilitated," and that "the Board has improperly 'ignore[d] the facts and circumstances of [Jones'] rehabilitation.'" (Quoting *Gard v. State Bd. of Registration for the Healing Arts*, 747 S.W.2d 726, 729 (Mo. App. W.D. 1988)).

Separately, the circuit court found that the Board's offer of two different settlements, under which Jones would be permitted to continue practicing, demonstrated that the Board had acted arbitrarily and capriciously in later revoking her license.

The circuit court's judgment remanded the case to the Board, and ordered the Board to issue Jones a nursing license under a three-year term of probation. The Board filed a notice of appeal on February 27, 2023. On April 3, 2023, in compliance with the circuit court's judgment, the Board entered an order placing Jones' nursing license on probation for three years.

## Discussion

## I.

Before turning to the merits of the Board's decision, we address Jones' claim that the appeal is moot because the Board voluntarily complied with the circuit court's judgment and granted her a probated license.

"A cause of action is moot when the question presented for decision seeks a judgment upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy." *Odermann v. Mancuso*, 670 S.W.3d 461, 469 (Mo. App. W.D. 2023) (citation and internal quotation marks omitted). "In deciding whether a case is moot, an appellate court is allowed to consider matters outside the record." *Stevens Fam. Tr. v. Huthsing*, 81 S.W.3d 664, 667 (Mo. App. S.D. 2002).

In a related vein, "[a] party may estop himself from taking an appeal by performing acts after the rendition of the order or judgment which are clearly inconsistent with the right of appeal." *In re Est. of Pethan*, 475 S.W.3d 722, 727 (Mo. App. W.D. 2015) (citation and internal quotation marks omitted). Therefore, when a party voluntarily pays a monetary judgment, or voluntarily surrenders possession of real property, those actions may prevent that party from prosecuting an appeal. *Id.*; *see also, e.g., Kinser v. Elkadi*, 654 S.W.2d 901, 903 (Mo. 1983); *Bravehart Real Est. Co. v. Peters*, 157 S.W.3d 231, 233 (Mo. App. E.D. 2004); *St. Charles Cnty. v. Wegman*, 90 S.W.3d 142, 144 (Mo. App. E.D. 2002). However, an *involuntary* act in compliance with a circuit court's judgment will not bar an appeal. For instance, a monetary payment may be deemed involuntary where it is made to prevent the accrual of interest on the

10

judgment, or to forestall collection actions when no supersedeas bond has been posted. *Est. of Pethan*, 475 S.W.3d at 727-28.

Despite the caselaw dismissing certain appeals where the appellant has voluntarily complied with a judgment, the Missouri Supreme Court has held that a State agency is not precluded from prosecuting an appeal where it issues a license in compliance with a circuit court's judgment, but could still obtain effectual relief if the circuit court's judgment were to be reversed. In *Wampler v. Director of Revenue*, 48 S.W.3d 32 (Mo. 2001), the Missouri Supreme Court held that the Director of Revenue did not voluntarily acquiesce in a circuit court's judgment when the Director reinstated a driver's license, as required by the judgment, pending appeal. *Id.* at 34. The Court explained:

> In this case, the director was ordered to restore Wampler's driving privilege "forthwith." Complying with this order was not in any sense voluntary. In this case, effectual relief can still be granted, even though Wampler's driver's license has been returned. The suspension or revocation could be upheld.

> Additionally, the director receives no benefit by complying with the trial court's judgment pending appeal. The director also does not have the option of staying proceedings by filing a bond. If the director does not return the driver's license pending appeal, the director risks being in contempt of court. It would be an absurd result not intended by the legislature to require that the director risk being held in contempt of court in order to preserve the right to appeal in cases such as this.

> Not allowing the director to return the driver's license pending appeal could be detrimental to persons whose licenses are suspended or revoked, particularly in cases where the suspension is for a relatively short period of time. If the director withheld licenses to avoid "acquiescence" in the judgment, the licensee would be without driving privileges between the date of the trial court's judgment and the time the appeal was completed instead of having his or her

license and a restored driving record pending appeal. The cases of those whose licenses are suspended or revoked for a short period would often become moot through the passage of time and the expiration of the suspension or revocation before the completion of their appeal. Alternatively, the driver is faced with the expensive prospect of swiftly pursuing a contempt action.

These cases are somewhat unusual. The director is forced to choose between withholding the license of a driver who has possibly been wrongfully suspended, thereby risking contempt, or returning a potentially dangerous driver to the streets waiving any right to appeal. Given this scenario, complying with the court's order is not a voluntary act, and the director did not acquiesce in the trial court's judgment.

*Id.* at 34–35.

The Court followed *Wampley* in *Kubley v. Brooks*, 141 S.W.3d 21 (Mo. 2004), in which it held that a mother was not estopped from appealing a child-support order issued by the Department of Child Support Enforcement, even though she had begun paying the support ordered by the Department while the appeal was pending. The Court noted that the mother had made the payments "under threat of further incarceration and contempt," and declared that "it would not further public policy to require her to refuse to support her children while her obligation to do so is being litigated." *Id.* at 28.

In light of *Wampler*, this case is not moot, nor is the Board estopped from appealing the circuit court's judgment. As in *Wampler*, given the nature of the judgment the Board had no right to a stay of the judgment by filing a supersedeas bond, and it therefore risked contempt sanctions if it failed to comply. In such circumstances, *Wampler* holds that interim compliance with a circuit court judgment during the pendency of an appeal is not "voluntary." Moreover, the parties' dispute over Jones' right to practice as a nurse remains ongoing. Even

12

though Jones is presently practicing under a probated license, effective relief could still be granted if the Board prevailed here, since that probationary license would be revoked if the Board's original decision is upheld. *Cf. State ex rel. Lutman v. Baker*, 635 S.W.3d 548, 554 n. 8 (Mo. 2021) (petition for writ of prohibition was not moot, despite disclosure of purportedly privileged communications, when the Court would be "able to effectuate a partial remedy because the harm to [the petitioner] is ongoing"). Finally, as in *Wampler* the Board should not be discouraged from complying with the circuit court's judgment on an interim basis while the appeal is pending. Courts should not force the Board to deny Jones her license, and presumably cause her to lose her employment, in order to preserve its appeal rights – such a ruling would cause Jones to suffer the consequences of a disciplinary order which the circuit court has found to be unlawful.

The motion to dismiss is denied.

## II.

In her first Point, Jones argues that the Board erred in revoking her license because the Board lacked substantial evidence to support its finding that Jones' evidence of rehabilitation failed to address the dishonesty or timing of her misconduct, and because it unreasonably discounted her evidence of rehabilitation.

"'In an appeal following judicial review of an administrative agency's decision [in a contested case], this court reviews the agency's decision and not the circuit court's judgment.'" *Unruh v. State Bd. of Nursing*, 618 S.W.3d 634, 636 (Mo. App. W.D. 2020) (quoting *Ringer v. Mo. Dep't of Health & Senior Servs.*,

306 S.W.3d 113, 114 (Mo. App. W.D. 2010)). "[H]owever, we affirm or reverse the trial court's judgment based upon such review of the administrative decision." *Kubiak v. Mo. State Bd. of Nursing*, 667 S.W.3d 230, 235 (Mo. App. W.D. 2023) (citations and internal quotation marks omitted). Thus, while the party aggrieved by the *circuit court's* decision files the notice of appeal, the party aggrieved by the *agency's* decision files the appellant's brief, and bears the burden to show that the agency erred in the first instance. Rule 84.05(e); W.D. Special Rule 35.

We review the agency's actions to determine if they "'are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record.'" *Wagner v. Mo. State Bd. of Nursing*, 570 S.W.3d 147, 151 (Mo. App. W.D. 2019) (quoting Mo. Const. art. V, § 18; other citation omitted). We presume that the agency's decision was correct. *Unruh*, 618 S.W.3d at 636.

We will affirm the agency's decision unless it:

> (1) Is in violation of constitutional provisions;
>
> (2) Is in excess of the statutory authority or jurisdiction of the agency;
>
> (3) Is unsupported by competent and substantial evidence upon the whole record;
>
> (4) Is, for any other reason, unauthorized by law;
>
> (5) Is made upon unlawful procedure or without a fair trial;
>
> (6) Is arbitrary, capricious or unreasonable;
>
> (7) Involves an abuse of discretion.

*Wagner*, 570 S.W.3d at 151-152 (quoting § 536.140.2).

This Court "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award[.] . . . An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-23 (Mo. 2003). "Likewise, the agency's failure to consider important aspects or factors of the issue can support a finding that the decision was arbitrary and capricious." *Mo. Real Est. Comm'n v. Held*, 581 S.W.3d 668, 676 (Mo. App. W.D. 2019) (citation and internal quotation marks omitted). We review questions of law *de novo*. *Kubiak*, 667 S.W.3d at 235.

The Nursing Practice Act, §§ 335.011-335.099, governs the licensure of nurses in Missouri. Under § 335.066.2, "[a] determination of whether cause exists to discipline a nursing license is generally made by the [Administrative Hearing Commission]" in the first instance. *Kubiak*, 667 S.W.3d at 236. In this case, the parties stipulated that cause existed for disciplining Jones' nursing license under §§ 335.066.2(1), (6), (13), (15), and (25), because she had unlawfully possessed morphine, a controlled substance.

The Nursing Practice Act provides that, upon a finding of cause for discipline, the Board "may, singly or in combination, censure or place the person named in the complaint on probation on such terms and conditions as the board deems appropriate for a period not to exceed five years, or may suspend, for a period not to exceed three years, or revoke the license, certificate, or permit." § 335.066.3.

15

Despite the wide latitude given to the Board in selecting appropriate discipline, the purpose of the Board's power to discipline "is not to punish misconduct but, rather, to protect the public." *Moore v. Mo. Dental Bd.*, 311 S.W.3d 298, 312 (Mo. App. W.D. 2010). "Punishment of the offender is not the purpose of a disciplinary action." *Wasem v. Missouri Dental Bd.*, 405 S.W.2d 492, 497 (Mo. App. 1966); *see also*, *e.g.*, *Brown v. State Bd. of Accountancy*, 588 S.W.3d 519, 523 (Mo. App. E.D. 2019) ("The primary purpose of the Board's ability to discipline license holders is not to vindicate the Board's own dignity upon being defied, but to protect the members of the Missouri public from potential harm."); *Kerwin v. Mo. Dental Bd.*, 375 S.W.3d 219, 232 (Mo. App. W.D. 2012).

In service of that principle, Missouri courts have held that licensing boards must consider not only the nature of the misconduct which provides cause for discipline, but also evidence of the licensee's rehabilitation and other mitigating circumstances. Thus, in *Gard v. State Board of Registration for the Healing Arts*, 747 S.W.2d 726 (Mo. App. W.D. 1988), this Court set aside the revocation of a physician's license by the Board of Registration for the Healing Arts, where the Board failed to consider the physician's evidence of rehabilitation. In *Gard*, a Missouri-licensed physician was convicted in California for possession and sale of controlled substances in connection with his medical practice. After serving two years in a California prison, the physician sought to return to medical practice. Although the physician presented evidence to the Board of his rehabilitation, the Board revoked his Missouri license, finding that the physician "'has offered no

16

substantial justification, mitigation, or showing of rehabilitation for the aforementioned offenses.'" *Id*. at 728.

In setting aside the Board's disciplinary order in *Gard*, this Court recognized that license revocation would be warranted "where there is a single act of conviction of a crime related to the practice of the profession without any extenuating circumstances." 747 S.W.2d at 729. The Court held, however, that the Board had erred by relying on the single fact of the physician's California conviction, while failing to take account of the significant evidence of his post-offense rehabilitation:

> ***What the Board here has done is to ignore the facts and circumstances of appellant's rehabilitation***, including his services to the California penal institution; his attendance at post graduate courses to renew his medical practice; the reinstatement of his California license to practice medicine; the letters from medical practitioners, officials and citizens of Missouri and California attesting to his high medical ability, and good moral character relating to his rehabilitation; that, in 1980, on returning to Missouri, he practiced his profession in the small communities of Sturgeon and Centralia, where he began to establish himself as a family practitioner, built up a good reputation, made friends, found rewarding extracurricular activities, and provided better medical care than the population of the areas had been receiving. . . .
>
> ***This case is not one of a single subjective fact, that of appellant's California conviction, conclusive in itself, which should bar him from practicing his profession***. Rather, the objective standards, replete in the record, of appellant's rehabilitation, which are undisputed, may be used to determine, *under the particular facts here*, whether the Board abused its discretion in revoking his license. This court holds that there was such an abuse.

*Id*. at 729-30 (first and second emphasis added; citation omitted).

17

*Gard* relied heavily on *State Board of Registration for Healing Arts v. Finch*, 514 S.W.2d 608 (Mo. App. 1974). In *Finch*, this Court held that the Administrative Hearing Commission had properly held that a physician was entitled to sit for the State's licensing exam, even though he had previously been convicted of first-degree murder, and sentenced to life imprisonment, in California. *Id.* at 610. The Board of Registration for Healing Arts sought judicial review, and both the circuit court, and this Court, affirmed the Commission's order.

In asking this Court to set aside the Commission's order finding the physician eligible for licensure, the Board placed "heavy emphasis upon the viciousness and depravity of Dr. Finch's crimes." 514 S.W.2d at 615. The Board contended that "the evidence relating to the convictions so eclipses any good inferences to be drawn from [the physician's] post-conviction conduct as to make the decision of the Commission contrary to the overwhelming weight of the evidence." *Id.* at 616.

*Finch* rejected the Board's contention that the seriousness of the physician's crime – first-degree murder – could *alone* disqualify him from licensure. Instead, the Court made clear that the Administrative Hearing Commission was *required* to consider mitigating evidence, beyond the physician's underlying criminal offense:

> Dr. Finch's crimes, which the Board would emphasize to the exclusion of everything else, occurred 15 years ago and his conviction was 13 years ago. Since that time, he has conducted himself in an exemplary manner and according to all of the evidence he appears to have sincerely repented and has accomplished a solid rehabilitation. ***The Commission would have been seriously remiss if it had followed the course apparently advocated by the***

18

***Board of refusing to give any weight to the impressive evidence of rehabilitation contained in the record.***

The loftiest goal of penology is rehabilitation of the fallen member of society, and the courts have been highly sympathetic to that goal and have been strongly inclined to give effect to sincere rehabilitation when it occurs. . . . [¶] . . . '***The duty of [the Commission] in the instant case was to determine whether or not the applicant was of good moral character at the time [he] applied for the licenses***. It would of course be proper to consider a former conviction, but that would not necessarily prevent the issuance of a license.'

514 S.W.2d at 616 (emphasis added; citations omitted).

In this case, Jones presented substantial evidence of her post-misconduct repentance, rehabilitation, and recovery. The Board purported to address that evidence, stating that:

It is certainly commendable the things [Jones] has done since being terminated [ ] in an effort to address her substance use disorder. But the most troubling aspect to her disorder and prior conduct, which the Board finds has not been adequately addressed in her evidence of rehabilitation, is the degree of dishonesty and how her wrongdoing began so soon after she received her nursing license.

The Board's conclusion that Jones' evidence of rehabilitation was insufficient to address her "degree of dishonesty" is unsupported by substantial evidence. During the Board hearing, Jones described in detail the extent of her drug use, and the means by which she stole medications from the hospital where she worked, and concealed her theft. Jones acknowledged her dishonesty – to her employer, to her family, and to her husband – and testified that she had shared details of her drug use with her husband and family as part of her recovery process. Jones' substance abuse counselor testified that Jones was candid about her drug use during therapy sessions. Jones' supervisor from the dialysis center

where she worked testified that Jones fully disclosed her history of substance abuse and treatment before she was hired; Jones explained that she did so because she felt that "being honest and open about it was the best thing to do."

Notably, the *only* evidence offered by the Board at the hearing was a *stipulation* in which Jones admitted to the acts which led to the termination of her employment, and admitted that those actions were sufficient cause for discipline under multiple separate provisions of the Nursing Practice Act. The Board's own evidence reflects that Jones has acknowledged and accepted responsibility for her past actions.

The Board's order did not find Jones' testimony, or any of her evidence, not to be credible; indeed, its order called her recovery efforts "commendable." While "[a]n administrative agency may base its decision solely on a finding of lack of credible testimony, though such testimony is uncontradicted or unimpeached . . ., the [Board] may not arbitrarily disregard or ignore undisputed testimony of a witness not shown to have been impeached or disbelieved by the [Board]." *Mo. Church of Scientology v. State Tax Comm'n*, 560 S.W.2d 837, 843 (Mo. 1977); *see also*, *e.g.*, *Lusher v. Gerald Harris Constr., Inc.*, 993 S.W.2d 537, 545 (Mo. App. W.D. 1999) ("Only if the agency makes a specific finding that undisputed or unimpeached evidence is incredible and unworthy of belief may it disregard such evidence." (citations omitted)); *Hay v. Schwartz*, 982 S.W.2d 295, 302 (Mo. App. W.D. 1998).

Given Jones' substantial evidence of her candid and enthusiastic participation in her substance abuse treatment program (including during numerous individual, group, marital, and family counseling sessions), as well as

the lack of *any* evidence from the Board suggesting deficiencies in Jones' treatment, the Board's finding that Jones' rehabilitation program failed to address her "degree of dishonesty" is not supported by sufficient competent evidence in the record.

The Board's order also concluded that Jones had failed to present evidence that her rehabilitation adequately addressed "how her wrongdoing began so soon after she received her nursing license." It is unclear *how* the Board expected Jones' rehabilitation to address this issue. The timeline of events (Jones' graduation from nursing school, her employment at Mercy Hospital East, her receipt of her nursing license, the commencement of her drug use, and the hospital's discovery of her drug use) consisted of historical facts which could not be altered. From all that appears, Jones candidly disclosed the nature, extent, *and timing* of her drug use during her treatment, and during the disciplinary proceeding. The temporal proximity between Jones' initial licensure, and the beginning of her drug use, was an immutable fact. As Jones' brief contends, "there is nothing that Jones could ever do to change when she first started diverting"; if the date her drug use began were itself disqualifying, "Jones could never be considered rehabilitated, no matter how long she remains sober or how sincerely she has thrown herself into the recovery process."

By stating that Jones' rehabilitation had failed to address the fact that her drug use began so soon after her licensure, the Board was essentially focusing exclusively on the nature of Jones' underlying misconduct, and disregarding her extensive, years-long rehabilitation efforts. If the commission of first-degree murder does not prevent a physician from being licensed in Missouri (*see Finch*,

21

514 S.W.2d 608), Jones' misconduct was not so heinous as to permanently disqualify her from holding a nursing license, without consideration of her extensive, documented efforts at rehabilitation. As an example, we have upheld the award of an unrestricted license to a physician: who began writing herself false prescriptions for controlled substances months after graduating from medical school; relapsed after undergoing treatment and being given a second chance by her employer; and continued her drug use and forging of prescriptions until her arrest over four years later. *State Bd. of Registration for the Healing Arts v. Trueblood*, 368 S.W.3d 259, 260 (Mo. App. W.D. 2012). As in this case, the physician in *Trueblood* began misusing her privileged access to controlled substances shortly after receiving that access. As compared to the circumstances in *Trueblood*, however, Jones' substance abuse was substantially less prolonged, involved more limited deceptive practices, and did not continue or recur after Jones' initial admission to a treatment program.

The purpose of professional license disciplinary proceedings is "not to punish misconduct but, rather, to protect the public." *Moore*, 311 S.W.3d at 312. As *Finch* explains, the issue in a disciplinary hearing centers on the licensee's fitness for licensure *at the time of the hearing*. As *Finch* and *Gard* instruct, where the hearing takes place long after the licensee's underlying misconduct, it is improper to focus solely on the underlying events without considering significant evidence of intervening rehabilitation and repentance. Yet, although the Board purported to acknowledge Jones' rehabilitation, and even labeled her actions "commendable," it justified the revocation of her license based solely on the severity of the underlying conduct. Jones' underlying misconduct was

undeniably serious, and justified discipline.  Nevertheless, the Board's failure to seriously weigh the undisputed evidence of her rehabilitation was arbitrary and capricious, and unsupported by substantial evidence.

Point I is granted.

### III.

In her second Point, Jones contends that she proved that the Board's revocation of her license was arbitrary and capricious, based on the Board's proposal of two different settlements under which Jones would be permitted to continue practicing.

Our grant of Jones' first Point, standing alone, justifies affirmance of the circuit court's judgment.  It is accordingly unnecessary for this Court to address the circuit court's alternative holding, which relied on the Board's settlement proposals.

### Conclusion

We affirm the judgment of the circuit court, which set aside the Board's revocation of Jones' nursing license, and ordered that the Board grant her a Registered Professional Nursing license, subject to a three-year probationary term on conditions specified in the circuit court's judgment.

_____
Alok Ahuja, Judge

All concur.

23